## Case No. 9,068.

### The MARGARET.

[5 Biss. 353; [1] 5 Chi. Leg. News, 565.]

Circuit Court, E. D. Wisconsin. July, 1873. [2]

SHIPPING—TUG AND TOW—GROUNDING OF TOW—PRESUMPTION OF KNOWLEDGE—SAILING QUALITIES—CONDITION OF HARBOR.

1. The captain of a tug is bound to know the sailing qualities of a vessel which he had towed into a harbor on several previous occasions.

[Cited in Stretch v. The Margaret, 2 Fed. 258.]

2. He is also bound to know the condition of the harbor, the effect of the wind and waves, and the necessary course to safely enter the harbor.

3. Though the tow should be properly steered and follow in the wake of the tug, the responsibility as to the mode, manner and speed of entrance, and the course pursued, is with the tug.

This was an appeal from the decree of the district court, dismissing a libel filed by Charles F. Bliss et al., owners of the brig Mechanic, against the tug Margaret, to recover damages by reason of the grounding of the brig while entering the harbor of Racine in tow of the Margaret. [Case unreported.]

DRUMMOND, Circuit Judge. This case has been ably argued, and it must be admitted is not free from difficulty. I have hesitated somewhat in consequence of the decision of the district judge dismissing the libel, but the parties are entitled to my best judgment on the facts, and not being able to agree with the district judge on some of the leading facts, and on which the case must turn, I shall reverse the decree.

The facts are, that the brig Mechanic, of which the libellants were the owners, in November, 1868, took on a load of lumber at Suamico, for Racine, and not far from noon on the thirtieth day of November, arrived off that harbor, and signaled the tug Margaret to come and tow her in. The tug accordingly went out and reached the brig, about a mile and a half from the harbor, the precise distance not being distinctly ascertained. The tug approached the brig on the starboard, or weather quarter, the wind at the time blowing from the north and west. A starboard line was thrown from the brig to the tug, and either then, or shortly afterwards, and before the tug entered the har-

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2] [Affirmed in 94 U. S. 494.]

bor with the tow, there was a port line attached to the tug, and the brig was taken in tow. At this time the brig was northeast of the harbor. The harbor consisted of two piers extending out into the lake in nearly an easterly direction, and about 175 feet apart, the north pier extending 300 feet further east than the south pier. The evidence is not entirely clear as to the precise manner in which the tug approached the harbor. The channel was close to the north pier, and was about 12 feet in depth, and perhaps not exceeding 75 feet in width. On the south side of the entrance, there was a shoal. In rounding to, or approaching the harbor, either at a greater or less distance from the north pier, there being a considerable sea or heavy ground swell driving into the harbor, apparently from the northeast, the brig sagged off to the southward, struck the shoal there, and finally was thrown, by the force of the swell, upon the south pier, and a hole stove in her quarter, and was sunk and very seriously damaged. The question is, whether this was the fault of the tug.

There are several points on which there is a conflict in the evidence. The first is, as to the time and place where the port line was attached to the tug. On the part of the libellants it is claimed that, in the first instance, the starboard line was attached and then the brig towed within a hundred feet, more or less, from the north pier, when the tug stopped and another line was called for and attached to the tug, and the lines tautened up, and in that way the tug curved around the north pier with both lines fastened, the brig having thus lost her steerage way, and in consequence of that was thrown over on the shoal.

On the part of the defense, it is claimed that a mile from the north pier, and almost immediately after the starboard line was attached to the tug, and before it was tautened up so as to really commence the operation of towing, the captain of the tug called for another line, and it was immediately attached.

This is the first and one of the principal points of conflict in the evidence. Another is, as to what caused the parting of the lines. On the part of the defense it is claimed that the swell of the lake, the rise and fall of the tug and the brig, not always together, caused such a strain on the lines in entering the harbor that the port line parted, and then the brig sagged over on the shoal, and afterwards the starboard line parted.

The fact is, that the brig did fall off and run aground, and the question is how it was done, judging by the best lights that are before us in the evidence.

I think this fact may be considered as established by the clear weight of the evidence; and it tends greatly to elucidate this case, and to enable us to arrive at a correct conclusion: It is that the port line did not part until the brig was aground. That removes

a great deal that was claimed as to the want of strength of the port line. It could hardly be expected that any line would stand the tension of a vessel of such tonnage, and loaded in the manner in which the Mechanic was when she was aground, and therefore it would not be surprising if the line should part under such circumstances.

The brig, then, did not run aground because the port line parted, but the port line parted because the brig ran aground. Now I think one of two things is true upon this hypothesis, that the tug had stopped or was moving so slow in entering the harbor that the brig lost steerage way in rounding the north pier, or that the tug had not given a proper opportunity, and had not the requisite steam upon her to enable the brig to enter the harbor, by laying the right course for that purpose.

Something was said of the brig not having ported her helm in time, and of her not being so manageable a vessel as some others. I think there is not sufficient evidence of any want of skill or diligence on the part of the brig in that respect. And as to the brig not being so manageable a vessel as others, if that were the fact it was known to the captain of the tug when he took her in tow, as he had taken her in port several times before, and it should have induced extreme caution in entering the harbor.

But perhaps there is no sufficient evidence indicating that the brig was any more unmanageable than vessels ordinarily are under such circumstances, and it seems quite clear to me that, from some cause not attributable to the brig, there was not sufficient steerage way on her, either in rounding the north pier or entering through the piers, to enable her to keep her course, and that the tug was bound to see that she had it.

There is a most extraordinary conflict in the testimony, especially in the first particular, namely, as to the time when the port line was given to the tug. Every witness on board of the brig declares that the starboard line was first given, and then, after a considerable interval, when the brig had been towed some distance, the tug arrested her progress and took in the other line and tautened them both up. On the part of the tug, this is asserted to be untrue. It is difficult to understand why, consistently, with the proper knowledge on the part of these witnesses, there could be such a conflict in the evidence upon so important a point; but without deciding where the truth may have been as to this point, I hold, as I have already stated, that owing to some cause, the fault of the tug, either in laying the course, or in turning the pier, the brig had not that control over herself through her helm as to enable her to lay her course so as to "hug" the north pier and go into the harbor by the regular channel. Now, the condition of the harbor, the ground swell, the depth of the water, were all better known to the tug than

to the brig. The tug had just left the harbor, and the captain of the brig told the captain of the tug how much the vessel drew at the time, and he therefore had all the data proper to determine what course he should take in towing the brig into the harbor.

Something was said about the protest, which was made almost immediately after the accident occurred, not having set forth that the tug was in fault. The protest does not pretend to state what was the cause of the fact which it alleges, namely, that in entering the harbor, the brig fell off to the southward and struck against the shoal, and therefore it is not a circumstance of any material weight in considering the general testimony in the case.

There is the more difficulty in this case because of the particular liability growing out of the relations between a tug and tow. The master of the brig perhaps misapprehended, to some extent, his relations to the tug. It is true the tow is under the control of the tug. The tug directs the course of the tow and its speed. The tug may be said in one sense to be the agent of the tow, and might be under certain circumstances required to accept an act under instructions from the tow. The theory of the master of the brig was that it was entirely under the control of the tug. While this is so in a general sense, it is not exclusively so. There are certain duties incumbent on those who have the management of the tow. It is the duty of the tow to be steered properly; to follow in the wake of the tug, and to perform all those duties which nautical skill demands in order to properly manage the tow. It will not do, in other words, to leave the tow without a suitable man at the helm, and the course of the tow must be directed in the wake of the tug; but, after all, as I have said, the tug controls the speed and the course of the tow, and in entering a harbor, such as that of Racine, the responsibility as to the mode and manner of entrance, the speed with which it is done, and the course to be taken, mainly, if not exclusively, rests with the tug. She should know the natural and necessary effect of the wind and of the waves upon herself and tow, and she should be managed with reference to herself and tow with competent nautical and engineering skill under the circumstances. This demand of the law was not, I think, met by the tug in this case, and, therefore, the court finds the tug was in fault, and liable for the damage sustained by the libellants, and refers the case to a commissioner to ascertain and report the amount of damages, and also to report the value of the tug at the time it was released, on the 2nd day of March.

[This case was taken by appeal to the supreme court, where the decree of the circuit court was affirmed. 94 U. S. 494.]

As to the relative responsibility of tug and tow, consult The I. M. Lewis and Aline [Case No. 6,991], The Mosher [Id. 9,874], and cases there cited.