## Case .No. 9,478.

### The MERRIMAC.

[2 Sawy. 586; 6 Chi. Leg. News, 248.] [1]

District Court, D. Oregon. March 31, 1874.

TOWAGE—CUSTOM—TOW-LINE—AT WHOSE RISK—NEGLIGENCE—DUTIES—COLLISION BETWEEN TUG AND TOW.

1. H. agreed with W. to tow his scow from Astoria to Cape Disappointment for twenty dollars, without mentioning which should furnish the tow-line: *Held*, that in the absence of any usage or understanding to the contrary, the tug was bound to furnish the tow-line as a part of the necessary means to perform the towage, as undertaken.

2. Where evidence was offered by H. to prove a custom to the effect that the tow was bound to furnish the tow-line in such cases: *Held*, that it was not sufficient. and that the master of the tow could not be affected by it, if established, unless knowledge of it was brought home to him.

3. Where a man on the tow furnished a line to the tug at the request of the master of the latter. but stated at the time that he did not think it sufficient to tow with: Quere, should the line be considered as furnished by the tow, and at her risk, or otherwise.

4. The contract to tow the scow and her cargo from Astoria to the cape was one of the hire of the carriage or transportation of the same for a compensation, and was. therefore, a bailment of the kind denominated "Locatio operis mercium vehendarum," in which the master of the tug was bailee. and .responsible for ordinary skill and diligence.

[Cited in Ye Seng Co. v. Corbitt, 9 Fed. 428.]

5. The tug M. left Astoria with the scow J. F. in tow. two hundred feet astern. on the last of the ebb tide. for Cape Disappointment, and

---

[1] [Reported by L. S. B. Sawyer, Esq.. and here reprinted by permission. 6 Chi. Leg. News, 248, gives only a partial report.]

met the flood tide and south-west wind abreast of Sand Island, as might have been reasonably expected, where such tide and wind always make a rough sea, and in attempting to tow said scow against the same, the tow-line of the tow and also of the tug parted, and the scow went on Chinook spit and was lost: *Held*, that the tug did not exercise ordinary skill and diligence in undertaking the voyage on the last of the ebb tide, or in attempting to tow the scow against the flood tide and wind; and therefore is responsible for the consequent loss of the same.

[Cited in The M. J. Cummings, 18 Fed. 183.]

6. Under the circumstances of the employment, with the exception of steering the tow, working her pump, and handling her end of the tow-line, the tug is responsible for the navigation of both vessels; and her duties were those of a private carrier for hire, just as much as if she had had her upon her own deck instead of astern, at the end of a tow-line.

[Cited in The Chickasaw, 38 Fed. 361.]

7. Where a tug negligently places a tow in a peril from which she is lost, it is no excuse that the tow might have been saved, but for a mistake of or want of skill in the crew of the latter, in bending a tow-line in a dangerous emergency, or the want of extraordinary ground tackle.

8. Where a tow has parted from the tug and gone adrift, and is in great peril, and the latter, at the request of the crew of the former, attempts to take them off, and in so doing collides with the tow and sinks her, the tug is not responsible for the consequences of such collision, unless it was intentional or the result of gross negligence.

[Cited in The Allegiance, Case No. 207.]

In admiralty.

John A. Woodward and H. H. Northrup, for libellants.

William Strong and Joseph N. Dolph, for respondent.

DEADY, District Judge. This suit is brought to recover $2,500 damages sustained by the libellant in the loss of the John Francis and her cargo of eighty cords of ash wood, through the negligence of the tug Merrimac, while engaged in towing said John Francis from Astoria to Cape Disappointment, on September 9, 1873.

The vessel lost was a "schooner scow," of ninety-five and one-half tons burden, one hundred and twenty feet in length, twenty-one feet in breadth, and four and one half feet in depth, with two masts and a rudder and steering gear; she was decked over, fore and aft, carried an anchor weighing two hundred and eighty pounds, with thirty to forty fathoms of chain; she was built in 1866 for the wood and hay trade on the Columbia river, at a cost of $4,500. Some time in 1872, libellant bought her for $1,100, and afterward put $800 worth of repairs, rigging and sails upon her.

The Merrimac is a single engine-propeller, of fifty or sixty horse power, and forty-eight tons burden, and has been engaged for some years in towing on the Columbia river, and over the bar to and from the sea. About September 1, 1873, the libellant met the master of the Merrimac, Richard Hobson, of Portland, where conversation was had between them, to the effect that the former expected to be at Astoria in a few days with his scow, bound for Cape Disappointment, when he would want a tug and that the latter would be ready to tow him over.

Early in the morning of the ninth the John Francis arrived at Astoria from the mouth of the Sandy, in tow of the libellant's little steamboat, the Wasp. The Merrimac having heard the previous evening that the scow was on the way, came over to Astoria from Cementville in the night to meet her.

Here the libellant and the master of the tug met and made a contract, whereby the latter agreed to tow the scow over to the cape for twenty dollars, nothing being said as to who was to furnish the tow-line. This was about eight o'clock, and near the last of the ebb tide. The master of the tug directed the libellant to have the anchor of the scow lifted, and let her drift out from the wharf, and he would come around with the tug and take her in tow, and in the meantime the libellant was to take the Wasp in near shore and secure her and come off to the scow in his skiff.

The tug came alongside of the scow, and asked libellant's brother, who was the only person on board, to give him the line that was lying on the forward part of the scow, which he did. The tug then steamed along slowly, with the scow astern, for nearly a mile, when the libellant and another brother came on board the tow, and the tug steamed away at the rate of four or five knots an hour.

The distance from Astoria to the cape is about fifteen miles. Abreast of Sand Island, and about four miles from the cape they met the flood tide and wind from the southwest. At this point the sea is always rough during the flood tide. The wind and tide being on the tow's quarters, she began drifting to leeward, when the tug turned up to the tide, and the strain or surge parted the line some feet outside of the scow. The tug then backed up and gave the tow her line, which very soon parted short off some fifteen or twenty feet from the scow. Thereupon the tug gave the tow the long end of her line, and directed it to be bent on to the long end of the tow's line, which was done; but the knot slipped while being drawn through the water, and the line parted before it was drawn taut. By this time the scow had drifted within one hundred feet of Chinook spit, and the master of the tug directed the tow to drop her anchor, which was done, in about three fathoms of water, with twenty-five fathoms of chain. This was near the first black buoy. The scow, under the force of the wind and tide, dragged her anchor slowly in the direction of the spit, and the men on her called to the tow to come and take them off. The tug backed up to windward and alongside the scow, but as she reversed her engine to go ahead, it caught on the center for a moment,

and she drifted closer to the tow. As she passed the bow of the scow a swell caught her, and carried her across it, where her propeller got foul in the anchor chain, until it was paid out further, when she got away. During this time the guard of the tug struck the bow of the scow at one corner, and broke it down, so that the sea poured in and filled her in a few moments, whereupon the crew of the tow ran aft, jumped into their skiff and got on board the tug, which was distant some two hundred yards waiting for them.

The tug proceeded to the cape and returned at ebb tide, but the scow had drifted so far into the breakers that it was not considered safe to go to her with the tug. By the next morning at ten o'clock her bow was pulled out of her with the fastening of the anchor chain, and she went on to the spit, and was lost. The cargo of wood floated out as soon as she filled, and was lost.

The line taken from the tow was a four-and-a-half-inch line, about forty fathoms in length, and apparently in good condition. Henry Wilson, who gave it to the tug, testifies that the Merrimac came alongside, and Hobson asked him if the line lying forward on the tow "was strong enough for a tow-line." He answered, "I do not know; I do not believe she is;" when Hobson sang out, "Heave that line, and not stand there to look at it."

Hobson testifies: I asked Wilson "if that was the line he was going to tow with?" What he said in reply "I do not recollect." I then ordered him "to give us the line quick before we drifted away."

Ingalls, who took the line from the tow, testifies: "We went alongside, and asked if they had a line, and they began to hunt one up. They said they had one, and I took the line myself, and made it fast to the bitts."

J. W. Bloomfield, a passenger on the tug, and the person to whom the wood was sold to arrive at the cape, testified that "Hobson asked one of the men on the scow whether he had a good line. The man said he did not know whether the line was good or not. I think the man was Wilson's brother. Hobson said, 'Hurry and give us the line anyway.'"

Upon this testimony, I conclude that the transaction of taking the line from the tow took place substantially as stated by Henry Wilson.

The line of the Merrimac was a four-and-three-quarter-inch Manilla rope of about forty fathoms in length. It had been spliced, and subjected to severe strain in towing rafts of saw-logs.

Either of them were probably sufficient to tow the scow in smooth water, or with the tide, but not against the flood-tide, between Sand Island and Chinook spit, as the fact of their parting as they did abundantly proves. In this case the result is a safe criterion by which to judge of the sufficiency of the lines. The Webb, 14 Wall. [81 U. S.] 414.

The contract being silent as to who should furnish the tow-line, the respondent alleged and gave evidence tending to prove that there was a custom at the mouth of the Columbia river that in such cases the tow should furnish the line. The evidence in support of the usage is weak—comes mainly from witnesses who are interested in tugs—and, in my judgment, falls far short of establishing any such custom. The most that can be claimed for it is, that it establishes a usage in the case of sea-going vessels, particularly when being towed astern, that the tow shall furnish the line or pay the tug extra for furnishing it, but in the case of scows and the like, that the tow shall furnish the line if she has one, but if not, the tug shall furnish it without extra charge. Besides, it is clear that no usage upon the subject was known to the libellant, and before he can be affected by a custom so recent and local as this is claimed to be, knowledge of it must be brought home to him. 2 T. Pars. Cont. 57.

My impression is, that the undertaking to tow the scow from Astoria to the cape bound the respondent to furnish the necessary means to do the service with, and in the absence of any custom or understanding to the contrary, to furnish a sufficient tow-line as a part of such means. But the tow did furnish the line, and I think the tug ought not to be held responsible for its sufficiency, unless it appears there was some understanding that it was to be used at the risk of the latter. If the master of the tug called for the tow's line, and it was given and used without anything further being said or done by either party, the reasonable inference would be that the parties understood the contract as requiring the tow to furnish the line, or that they thereby modified or supplemented it to that effect. But in this case the man on the tow, in giving the line, also said he did not think it was sufficient, and there is reason for holding that, if the master of the tug took the line, notwithstanding this opinion, he took it upon his own judgment and risk. He testifies that he thought the line was sufficient. Still, when the master of the tow came on board, he made no objection to the use of the line, and manifestly did not think it insufficient. Upon the whole, it is not clear to my mind whether the circumstances under which the line was given and taken from the tow constitute an implied agreement that it was to be used as the line of the tow, and at her risk, or otherwise. As the case may be satisfactorily disposed of upon another ground, it is not necessary to definitely decide this question.

The contract to tow the scow and her cargo from Astoria to the cape was one of the hire of the carriage or transportation of the same for a compensation, and was therefore a bailment of the kind denominated locatio operis mercium vehendarum. The services of the

tug, and her master and crew, were hired by the libellant for that purpose. This constituted the libellant the bailor, and the respondent the bailee, of the scow and her cargo. Story, Bailm. § 370; Edw. Bailm. 338.

This is a bailment which is beneficial to both parties, and the bailee is responsible for ordinary skill and diligence. Edw. Bailm. 371; Story, Bailm. 457. But he is not a common carrier, and may contract for a more restricted liability than the law imposes upon him. Alexander v. Greene, 3 Hill, 19; The Webb, 14 Wall. [81 U. S.] 414. Counsel for respondent insists that this hiring did not amount to a bailment of any kind, and in support of this proposition, cites a dictum of Bronson, J., in Wells v. Steam Nav. Co., 2 Const. [2 N. Y.] 208, to that effect. It was decided in that case that the proprietor of a tow-boat was not a common carrier, as to the boat towed, but the dictum that such proprietor was not a bailee, and that the transaction was not a bailment, is in direct opposition to the language of all the authorities, as well as that of the learned judge elsewhere in the same opinion, and in Alexander v. Greene, supra.

The master of the tug being a bailee for hire, and as such responsible for ordinary skill and diligence in the performance of his contract, what was his duty in the premises? Impliedly he undertook to furnish a tug, properly equipped, and of sufficient capacity and power to take the scow to the cape, and for the exercise of ordinary skill and prudence in selecting the proper time to make the voyage, with reference to the craft to be towed, and the wind and tide, or other ordinary peculiarities of the navigation, and in the conduct of the enterprise in the case of any unlooked for or extraordinary emergency.

Of course the relations between the tug and the tow may be modified by express agreement, or the reasonable implication arising from the circumstances and nature of the employment in a particular case, so as to make the tug the mere servant of the tow and under its direction. In such a case the liability of the tug may be limited to the mere point of furnishing a sufficient motive power for the tow, while the whole responsibility as to the time and manner of making the voyage or transportation would rest with the latter. Sturgis v. Boyer, 24 How. [65 U. S.] 121.

In this case the scow being towed astern a distance of some two hundred feet, with her own master and crew aboard, the tug is not responsible for the manner in which she was steered. It is evident from the circumstances that the tow relied upon her own steering gear and crew to keep her in the proper place in the channel, so far as the course of the tug would permit. Sproul v. Hemmingway, 14 Pick. 7. Neither is the tug responsible for any injury which may have happened to the tow by reason of any defect or deficiency in her condition, construction or appointments,

considered as a scow. It was implied in the contract to tow her, that the John Francis was as seaworthy as vessels of her class and construction ordinarily are.

But as to all the other matters involved, or to be performed in the undertaking, I think the tug is responsible for any lack of ordinary care or diligence on the part of the respondent.

The water to be crossed was not an ordinary one. The peculiar difficulties and dangers of the voyage were well known to the respondent, and almost unknown to the libellant. The vessel to be towed was a flat-bottomed one, with a square head and stern, well loaded down with wood. She could be towed to the cape on the ebb tide with comparative safety, while it is almost certain that she could not be towed against a flood tide between Sand Island and Chinook spit.

Under the circumstances, there was a want of ordinary skill and diligence on the part of the respondent in leaving Astoria with this scow in tow for the cape on the last of the ebb tide. He could not expect to carry it with him, and must have known that he would meet the flood tide and wind at Sand Island, where it always made a rough sea against which it would be dangerous to tow the scow. The Brooklyn [Case No. 1,938]; The M. M. Caleb [Id. 9,680]; The Olive Baker [Id. 10,489]; The Blanche Page [Id. 1,-523]; The M. A. Lennox [Id. 8,987]; The Deer [Id. 3,737]. To obviate the force of these facts counsel for respondent claims that the voyage was delayed half an hour waiting for the libellant to join the scow after the tug had hitched on to her, and that this was the cause of being caught in the flood tide.

Taking all the circumstances into consideration, I do not think this proposition is supported by the evidence, and if it was, it does not justify the respondent in putting the scow into the peril, from the effects of which she was lost.

The testimony as to the time which elapsed between the hitching on to the scow and the libellant's joining the latter, varies from fifteen to thirty minutes, and as to the distance made in the meantime, from a quarter of a mile to a mile. The weight of the evidence is, that the time was not to exceed twenty minutes, and the distance not more than three fourths of a mile.

The tug was making four to five knots an hour until she met the flood tide, and, had the ebb served, she would have made the cape in something more than three hours. The evidence is not clear and direct to the fact, but the reasonable inference from all the circumstances is, that the tug did not make more than two and a half knots an hour against the flood tide. The witnesses all agree that the vessels met the flood tide abreast of Sand Island, and this is very probable when it is remembered that they left Astoria on the last of the ebb tide—near low water. As indicated by the chart, this is

about four miles from the cape. If, then, there had been no delay in starting, the tug would have met the flood tide in apparently the roughest place in the channel—about two miles from the cape—and encountered substantially all the perils she did, with, in all probability, the same results.

But, for the sake of the argument, admit that the loss occurred on account of the delay. That does not excuse the respondent. The delay occurred while the respondent was in command and under his direction; and it does not appear that the libellant occupied any more time in making the Wasp fast and getting back on to the scow than was necessary and anticipated, and allowed for when the contract was made. By his undertaking he was bound to know whether it was prudent to start when he did or proceed on the voyage after the libellant came on board. The libellant gave no direction in the premises from the time the contract was made until he called to the tug to take them off the scow, and assumed no risks save those which the law necessarily cast upon him.

But suppose that the respondent had good reason to believe, when he started, that he could make the cape without encountering the flood tide, still when the fact proved otherwise, I think it was his duty, as a prudent man, to return to a place of safety and await the high tide and smooth water; particularly when it is considered that the only tow-lines on board were insufficient to draw the scow through that sea, even if she could ride it.

With the exception of steering the tow, working her pump and handling her end of the tow-line, the tug is responsible for the navigation of both vessels. Her duties were those of a private carrier of the tow for hire, just as much as if she had had her upon her own deck instead of astern at the end of a tow-line. In Sturgis v. Boyer, 24 How. [65 U. S.] 122, it was held that "whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels." While in this case the tow had her master and crew on board, yet they had nothing to do with the navigation of either vessel except to steer the tow in the wake of the tug, to work her pump and handle her end of the tow-line. In other respects the navigation of the tow was as much under the control of the tug as if there had been no one on board of her. The master of the tug selected his own time for starting, as he said that the scow could not be towed over the route except in time of smooth water. While they were under weigh no communication passed between them, except when the tug backed down to give the tow her line.

Respondent also insists that if the two pieces of lines had been properly bent together, the knot would not have slipped and the scow might have been saved. Each of these lines had just snapped like a mere thread, and there is nothing in the evidence or circumstances which makes it even probable that the increase in length, caused by fastening them together, would have made them sufficient to tow the scow against that tide and wind if the knot had held.

The fault alleged is, that the libellant did not seize the knot. But certainly it could not have been expected that when the scow was about going into the breakers the libellant would take time to go after and get some small cord and deliberately seize this knot. Nothing of the kind was directed or suggested by the respondent when he gave the order to bend the lines together. Apparently the knot was well made, but while being drawn through and against the water it loosened, and as the line became taut, slipped. But even a mistake in this matter by the libellant would not excuse the tug, which had already negligently brought the scow into this peril. The Webb, 14 Wall. [81 U. S.] 417.

As to what followed after the scow cast anchor I do not think it material. It is possible that the scow might have ridden safely at the place she was left by the tug, until the turning of the tide, if her anchor had been larger and the chain longer. But the peril, which resulted in her loss, had already been incurred by the negligence of the respondent. The Webb, 14 Wall. [81 U. S.] 417; The Merrimac, Id. 203; Union S. S. Co. v. New York & V. S. S. Co., 24 How. [65 U. S.] 313. The libellant was not bound to have provided his scow with ground tackle sufficient to hold her in such an extraordinary position as that. In my judgment her ground tackle was sufficient for all ordinary emergencies.

So with the collision that occurred in attempting to take the libellant and his brothers from the tow after the anchor was dropped. The responsibility of the tug, under the contract to tow the scow, was at an end. For the time being the undertaking had been abandoned by the tug. In going to the scow, at the request of the libellant, the tug was employed more as a salvor than otherwise, and is not responsible for an injury to the scow caused by a collision under such circumstances. There is no doubt but that the collision occurred, and that the scow was sunk and the wood washed away as the immediate consequence of it. But I do not think the tug was handled so unskillfully or carelessly as to make her liable for the consequences.

In the bill of particulars the scow is charged at $1,800, the wood $400, and the furniture, stores, clothes, etc., at $301. I find their value as follows: Scow, $1,200; wood, $280; other articles, $150; making in all $1,630. The wood cost libellant $2.50 a cord, on the bank, at Sandy, and he had sold it, to arrive at the cape, for $4.50. I have allowed $3.50 per

cord for it at Astoria. These are coin valuations, to which I add ten per centum for the difference between coin and currency, which makes it $1,793.

The libellant, within a day or two of the disaster, went out to the wreck and recovered the anchor and chain from the sand, and some blocks, ropes and rigging from the hull of the scow. Of these he has sold all but the rigging for $73, which he values at $40. Allowing him one third of this amount for saving these things the remainder—$75.33⅓—must be deducted from the above, which leaves the sum for which the libellant is entitled to a decree, $1,717.66⅔ and the cost of suit.