## THE INVERTROSSACHS and THE JAMES McCAULLEY.

### THE JAMES McCAULLEY v. THE PERCY BIRDSALL et al.

(Circuit Court of Appeals, Third Circuit. November 21, 1893.)

### No. 14.

COLLISION—VESSEL AT ANCHOR—TUG AND TOW.

A heavy ship in light ballast, with a pilot aboard, while coming up the Delaware river in tow of a tug on a hawser 120 to 130 fathoms long, struck a schooner lying at anchor at Bombay Hook, a quarter of a mile west of mid-channel, the channel there being one mile wide for vessels of deep draft. The tug was competent to handle the ship, and was not in fault as to the course taken to pass the schooner, but the ship failed to follow her, and impeded her progress eastward by hanging on her port quarter. *Held*, that the collision was caused solely by the failure of the ship to properly follow the tug, and the ship was alone liable for the damage. 55 Fed. 683, modified.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

In Admiralty. Libel by Elias Burr, master of the schooner Percy Birdsall, on behalf of her owners, against the ship Invertrossachs, for damage to the schooner by collision with the ship in tow of the steam tug James McCaulley. On petition of the claimant of the ship the tug was made a codefendant. The district court found both the tug and the ship in fault, and a decree against both was rendered in favor of the schooner, and in favor of the ship against the tug for half damages. 55 Fed. 683. The owner of the tug appeals. Reversed as to the decree against the tug, and decree directed against the ship for the full amount of the damages.

John F. Lewis, for appellant.

Horace L. Cheyney and J. Rodman Paul, (Biddle & Ward, on the brief,) for the Invertrossachs, appellee.

Curtis Tilton, for the Percy Birdsall, appellee.

Before ACHESON and DALLAS, Circuit Judges.

ACHESON, Circuit Judge. This is an appeal by the owner of the steam tug James McCaulley from the decree of the district court in admiralty against the appellant for one-half of the damages awarded to the libelant in a cause of collision. The libel was filed by the master of the schooner Percy Birdsall, on behalf of her owners, against the British ship Invertrossachs. The claimant of the ship filed a petition in accordance with admiralty rule 59, and brought in as a codefendant in the suit the tug James McCaulley.

The facts of the collision are these: Early in the morning of January 10, 1892, before daylight, the schooner Percy Birdsall came to anchor at Bombay Hook point in the Delaware river, well over to the western side of the channel,—a quarter of a mile west of mid-channel, according to the testimony of her master. At that place the channel for vessels of deep draft is about one mile wide. The schooner was lying nearly head down the stream. Her anchor light was properly set and kept burning. No fault is imputable to her. The ship Invertrossachs, with a Pennsylvania pilot on board, was coming up the Delaware river in light ballast, in tow of the tug James McCaulley, on a long hawser; about 40 fathoms of the ship's wire hawser being attached to a tow line 80 or 90 fathoms long leading from the stern of the tug. About 5 o'clock that morning, while it was yet dark, the ship Invertrossachs ran afoul of the schooner, the ship coming into the schooner nearly head on, and striking the starboard bow of the schooner just forward of her cat-head. The tug passed in safety on the schooner's port side.

The learned district judge held both the tug and the ship to have been in fault; "the former in running with her unwieldly tow so far westward in the channel, and in approaching so near the schooner before turning off; and the ship in failing to change her course, and follow the tug, until the collision was inevitable." The opinion of the court is very brief. It does not discuss the proofs at all. It does little more than announce conclusions. In respect to the ship it declares that "the evidence fully justifies the belief" that she "was negligently handled. The warning of her lookout was not properly heeded. She seems to have committed herself to the guidance of the tug, and to have paid little heed to the latter's movements." And it is added: "The fact that the ship was very heavy, and the tug's control of her very imperfect, imposed on both unusual vigilance, and rendered the duty of keeping well over to eastward the more imperative." In accordance with these views, the district court gave a decree against both the tug and the ship, and apportioned the damages one-half to each.

Now, we quite agree with the court below that the ship was negligent in the several particulars mentioned; but we are unable to concur in the conclusion that the tug was blameworthy.

The petition on behalf of the ship particularly specifies in what the alleged negligence of the tug consisted, but does not charge or intimate that she was in any fault in running too far westward in the channel. Nor does it appear that the Pennsylvania pilot, who was employed for the voyage up the Delaware river, and was aboard the ship, objected to the course up stream the tug was pursuing, or directed her to keep further eastward. Indeed, testifying on behalf of the ship, the pilot, in his examination in chief, says that there was plenty of deep water on either side of the schooner, and that "the best way to have steered the steamer would have been to starboard the wheel, and go to the west side of the schooner." We are not able to find in this record evidence to sustain a finding that the tug was negligent in running her tow too far westward in the channel. Neither do we discover good ground

for the suggestion that the tug's control of the ship was imperfect. In so far as the evidence touches the capacity of the tug, it indicates that she had ample power to handle the ship had the latter performed her duty in following. The testimony with respect to the difficulty the tug experienced relates to the misconduct of the ship in "hanging on" the tug's port quarter, and impeding her progress eastward when she was on that course to pass the anchored schooner.

Samuel Christy, the ship's lookout; William Finlayson, the helmsman; Arthur C. Caines, the mate who was on watch; and Albert G. Bennett, the pilot,—were examined on behalf of the ship.

The lookout testifies that he reported the schooner's light twice before the collision. That before his first warning the tug had sheered well off to starboard; he could not say exactly how long before; it might have been a minute or two. That he saw the light which proved to be that of the schooner a trifle on the port bow of the ship. That the schooner was then a "good ways off." That, seeing the ship did not alter her course, he "thought it time to sing out," and did so, but got no answer. That he then waited some time, (his estimate is five minutes,) and then gave a second warning, and still got no answer. That the collision occurred two minutes after the second report. That he saw no one on the deck of the ship until after the vessels had come together, when the pilot came forward on the forecastle head. He states that if the ship had followed the tug she would have cleared the schooner, "for she had plenty of time." Of all the witnesses aboard the ship the lookout had the best opportunity for observing what occurred and of forming a correct judgment. He seems to have been alert.

The helmsman corroborates the lookout as to the two warnings of lights ahead, and judges that the first report was four or five minutes before the collision. He states that from his position he could not see the schooner's light; that he did not know there was any particular reason for porting his helm; that he got no order to do so; that, acting on his own responsibility, he put his helm slowly to port about the time the lookout gave the second warning, which was as soon as he observed that the tug's position was changed, but he says that the tug might make a difference of a point or two in her course before he could tell; that when the first warning was given he saw none of the officers on deck; that between the first and second warnings the pilot came on deck out of the chart room, but gave him no orders. On cross-examination he states that if he had known the position of the object ahead, or had received proper orders when the light was first reported, the collision would have been avoided.

The mate states that he was on deck when the lookout first reported a light ahead, but not where he could see it; that he went on the starboard side of the poop deck, but could not there see it; that as soon as he got there the lookout reported the light the second time; that he sung out "all right," and ran across to the port side of the poop, and found there the pilot, who gave the order "hard aport," and that almost immediately thereafter the ship struck the

schooner. He says the interval between the first warning and the collision was so short that the ship could not have cleared the schooner, even if the helm had been put hard aport on the lookout's first report.

The substance of the pilot's statement is this: That he was standing in the chart room door, looking out, when the lookout reported a light; that he immediately went to the port side of the poop deck, and could see nothing; that he stopped there a few seconds, and then went to the starboard side, but saw no light; that after the lapse of a few seconds he walked back, and had got amidships, when a second report from the lookout came, and he immediately ran to the port side, and by leaning over the rail could see the light nearly ahead; that he then gave the order "hard aport," and "went to the starboard side, to see the position of the tug," and by the time he reached the starboard side the ship had struck the schooner. He expresses a positive opinion that between the time the tug sheered off and the time of the collision it was not possible for the ship to clear the schooner; but we regard his opinion as worthless, for it is plain from his whole testimony that he had not been paying any attention to the movements of the tug. The evidence is convincing that for at least one hour before the disaster he had left the navigation of the ship entirely to the lookout and helmsman.

As it was the ship that struck the schooner, while the tug passed at a safe distance, undoubtedly the burden of proof is upon the petitioner, the claimant of the ship, to establish the tug's alleged negligence in approaching too close to the schooner before turning off. But upon that issue the clear weight of the evidence, in our judgment, is against the ship, even if attention is confined to the witnesses who were aboard the ship, and were called on her behalf. It is, indeed, said that the lookout and helmsman were hostile to the ship; but of this there is not a particle of evidence. Their testimony impresses us as candid and truthful.

There is, however, other trustworthy testimony in exculpation of the tug. Swayne Lawson, the tug's mate, who was in the pilot house at the wheel, testifies that he sighted the light which turned out to be that of the schooner Percy Birdsall about 20 minutes before the collision, and at a distance, he thinks, of 2 miles, the light being then about one-half point on the port bow of the tug; that as soon as he saw the light distinctly, and 15 minutes before the collision, he commenced to change his course, porting his wheel, and going off eastward; and that he continued gradually so to haul off until he had the schooner's light on the tug's port bow two or three points, so that when abreast of the schooner the tug was off to the eastward a distance sufficient to give the tow ample clearance. He estimates the distance to have been 80 or 90 fathoms. He further states that, while the tug was thus steadily hauling off to the eastward, the ship kept "hanging on" the tug's port quarter, and did not steer after her; but he still thought "the ship would come up and follow the boat," and he "had no idea she was going to run into the schooner." There is nothing in the state-

ments of this witness, when his testimony is fairly read as a whole, to justify an inference that the tug made a sudden sheer. His whole account of the transaction is straightforward. In itself, it is probable; and it accords with all the unquestioned facts. The negligence of the ship, which is indisputable, sufficiently accounts for the disaster, and the proofs, taken altogether, we think exonerate the tug from the charge of having carelessly brought her tow in dangerous proximity to the schooner.

Little need be said with reference to the charge against the tug of negligence "in failing to sound her whistle, or to give any notice to those in charge of said ship of any change in the course of said tug." The weight of the expert testimony upon the question of the duty of the tug to signal to the ship is against the latter. We think the tug owed no such duty to her tow. Although not promptly following the tug, but "hanging on" her port quarter, the mate of the tug was justified in assuming that the ship, with the pilot aboard of her, would avoid the schooner, as she could easily have done had her officers been attentive to their duties.

Upon the whole case we are satisfied that the collision was altogether due to the negligence of those who were aboard the ship, and charged with her navigation, and that the tug was not in any wise in fault. Therefore the claimant of the ship is justly answerable for the entire damages.

The decree of the district court is reversed, and the case is remanded, with a direction to enter a decree for the libelant against the claimant of the ship Invertrossachs and his stipulator for the full amount of the damages, with interest from August 5, 1893, and costs in the court below and in this court.