PEDERSON v. JOHN D. SPRECKELS & BROS. CO.

(District Court, N. D. California. May 24, 1897.)

No. 11,212.

TOWAGE—INJURY TO MATE OF TOW—LIABILITY OF TUG OWNERS.

 A schooner was taken in tow by a tug. The mate of the schooner superintended the fastening of the line on the schooner, and caused it to be passed through the breast chock instead of the forward chock, and made fast to the pawl bitt, instead of to the windlass bitt, which would have given a straighter lead, and been in accordance with better seamanship. In the towing, the breast chock gave way, and the rope struck the mate, throwing him against the capstan, and breaking his leg. *Held*, on the evidence, that the breaking of the chock was due to this manner of fastening, and not to excessive speed of the tug, and that the tug owners were not liable.

Libel in personam to recover damages in the sum of $20,000 for alleged negligence in towing the schooner S. Danielson at an excessive speed, thereby breaking the breast chock on the schooner, and throwing the libelant against the capstan, breaking his leg.

H. W. Hutton, for libelant.

Delmas & Shortridge, for respondent.

MORROW, District Judge. This is a libel in personam by Louis A. Pederson to recover damages in the sum of $20,000 from the John D. Spreckels & Bros. Company. The libelant was the mate of the schooner S. Danielson. At the time of the accident, which occurred on the morning of the 6th of August, 1895, the schooner was being towed in the waters of the Santa Barbara Channel by the tug Vigilant, owned by the respondent. The towline was made fast to

the pawl bitt, and had been passed through the side or breast chock on the port bow. There were two chocks on the port bow,—the forward and side or breast chock. On the starboard side, there was only one chock,—the breast chock. What had become of the forward chock, or how it had been removed, does not appear. The libelant, as mate of the schooner, had himself supervised the manner of making the towline fast to the schooner, and at the time of the accident was standing between the bitt and the chock, on the inboard side of the towline, engaged in parceling the line. The towing had been going on for a short period of time, variously estimated by the witnesses at from 4 to 20 minutes, when the chock through which the line had been passed broke or was carried away, and libelant was struck by the line, thrown against the capstan, and his leg broken. That limb was so severely injured that amputation was made necessary. It is claimed on behalf of the libelant that the accident was caused by the negligence of those in charge of the tugboat, in towing at such an excessive speed that the chock through which the towline had been passed was pulled in two, thereby causing the towline to catch libelant's leg and throw him against the capstan, resulting in the serious injury referred to. The respondent denies any negligence in towing at an excessive speed, and claims that the accident was caused primarily by the contributory negligence of the libelant himself, to which the bad steering on the part of the schooner, as contended, also contributed. The questions involved are purely of fact, and involve, to a great degree, the credibility of the witnesses on both sides. The first question is as to whether the line was made fast properly to the schooner by those on board of her, who were acting under the mate's orders. Evidence was introduced on behalf of the respondent tending to show that when a line is made fast to the pawl bitt, as it was in the case at bar, it should be passed through the forward chock; and, if it is made fast to the windlass bitt, it should be passed through the side or breast chock. It is considered better seamanship to pursue this method,, for the reason that the lead will be more straight, and the strain on the chock and the lead itself less. In the case at bar, as previously stated, the towline was passed through the breast chock, and made fast to the pawl bitt, which was not in accordance with good seamanship. As it was made fast to the pawl bitt, it should have passed through the forward chock, or, being placed through the breast chock, it should have been made fast to the windlass bitt. Either one of these ways would have obviated the unequal and unnecessary strain which results when the line is passed through and made fast as it was in this case. As this was done under the orders of the libelant, who himself supervised making fast the vessel's end of the towline, it results that, if the carrying away or breaking away of the breast chock was caused proximately by the unequal and unnecessary strain placed upon it, this would debar the libelant from recovering any damages for his injuries from the respondent company, for the reason that he contributed to the accident and injury to himself. Aside from the fact that the libelant personally directed how the towline should be made fast to the schooner, it is well settled that the tow is generally held responsible

for the management of her end of the towline.    As was said in The
Merrimac, 2 Sawy. 586, 17 Fed. Cas. 126:

"While in this case the tow had her master and crew on board, yet they had
nothing to do with the navigation of either vessel, except to steer the tow in
the wake of the tug, to work her pump, and handle her end of the towline."

See, also, upon the general duties of the tow, The Margaret, 5 Biss.
353, 16 Fed. Cas. 713; Sproul v. Hemmingway, 14 Pick. 1; The
Ciampa Emilia, 46 Fed. 866; The Jacob Brandow, 39 Fed. 831; The
Invertrossachs, 8 C. C. A. 87, 59 Fed. 194.

I am convinced, from the evidence, that the manner in which the
towline was made fast, and passed through the breast chock on the
schooner, was what caused the unequal strain on the chock and car-
ried it away.    It is, however, strenuously contended by counsel for
the libelant that the efficient and proximate cause of the breaking
or carrying away of the breast chock was the excessive speed at
which the tug was towing the schooner.    Testimony was introduced,
in support of this contention, tending to show that the tug was going
at the rate of 9 to 10 miles an hour, and that this speed, under the
circumstances, was excessive, and caused the breaking of the chock.
This testimony, however, is flatly contradicted by witnesses on behalf
of the respondent, whose testimony strongly tends to show that the
tug was going no faster than six or seven miles an hour, and that this
rate, under the conditions of weather then prevailing, was reasonable
and proper.    The weather was calm and pleasant; the water
smooth.    The schooner's register was 87 tons gross, 83 tons net,
91.9 feet in length, 27.6 feet in breadth, and 6.8 feet in depth.    On
this particular occasion she carried 5 tons of iron.    She was about
10 years old.    Whether or not there was anything faulty about the
chock itself, does not appear from the evidence.    It seems, however,
that the forward chock on the starboard bow was gone.    When this
happened, or what caused its disappearance, does not appear.    Upon
the whole of the evidence presented on this point, I am inclined to
accept the testimony of the witnesses for the respondent as being
more reliable and accurate.    It is true that there are some discrep-
ancies and contradictions in the testimony, but, upon the whole of
the evidence, I come to the conclusion that the tug was going not
more than seven miles an hour, and that this, under the circum-
stances then prevailing, was not an unreasonable and improper rate
of speed, and was not the proximate cause of the breaking of the
breast chock.    It is further claimed by respondent that bad steering
by the captain of the schooner, who was in charge of the helm, con-
tributed to the breaking of the chock, by increasing the strain there-
on.    But, however that may be, I am satisfied that the accident was
due, for the most part, to the manner in which the line was passed
through the breast chock, and made fast to the pawl bitt.    There is
no question as to the sufficiency or stability of the rope.    To whom
it belonged,—whether to the schooner, or to the California Iron &
Wrecking Company,—is not entirely clear; but one thing is certain,
and that is that it did not belong to the tug.    It was a new rope,
having been used but a few times before this occasion.    It broke
some 15 minutes after the accident which befell the libelant.    Coun-

sel for libelant claims that this indicates that the tug was going at an excessive speed, for the reason that a new rope would not break unless the strain upon it were of an extraordinary nature. But there is testimony which tends to show that the rope, after the chock broke, was subjected to chafing, and that its breaking was caused by this fact, and not from any great or extraordinary strain placed upon it by towing at an excessive speed.

Counsel for libelant has cited many cases to support his contentions. I fail, however, to see how any of them can be deemed applicable to the facts of this case. There can be no question about the general principles applicable to the case at bar. In the first place, it is well settled that tugs engaged in towing vessels are not common carriers; that they are not insurers, but are bound simply to use ordinary care and skill in towing. The Webb, 14 Wall. 406; The Margaret, 94 U. S. 494. In the second place, the burden is cast upon the libelant to show, by a fair preponderance of evidence, that the respondent has been guilty of negligence which proximately caused the accident and injury to libelant. Shear. & R. Neg. §§ 12, 14. No presumption of negligence can fairly be said to arise in this case from the mere fact that the libelant was injured. This is not a case where it can fairly be predicated, from the evidence, that the thing which caused the injury to libelant was under the management or exclusive control of the respondent, bringing the case within the rule laid down in Byrne v. Boadle, 2 Hurl. & C. 722; Scott v. Docks Co., 3 Hurl. & C. 596, 601; Kearney v. Railway Co., L. R. 5 Q. B. 411; s. c., affirmed L. R. 6 Q. B. 759; Howser v. Railroad Co., 80 Md. 146, 30 Atl. 906; Dixon v. Pluns, 98 Cal. 384, 389, 33 Pac. 268. The accident and injury took place on board the schooner, and not on the tug. The towline was furnished by the vessel, and not by the tug; and it was made fast under the directions and personal supervision of the libelant, the mate of the schooner, and not by virtue of any order, supervision, or advice from those having charge of the tug. Upon the entire evidence in the case, I am of the opinion that the libelant has failed to prove by a fair preponderance of evidence that the towing of the schooner by the tug Vigilant was negligent, and was the efficient, proximate cause of the accident and injury which befell the libelant. The libel will be dismissed, with costs.