## Case No. 207.

### The ALLEGIANCE.

[6 Sawy. 68.][1]

District Court, D. Oregon. Oct. 29, 1879.

SALVOR, UNDERTAKING OF — DUTY OF TOW — SALVAGE BY STEAM TUG — COMPENSATION.

1. A salvor does not undertake to succeed in saving the property in peril, but only that he will exercise ordinary skill and diligence in the use of the means or machinery with which he undertakes the salvage service.

2. It is the duty of the vessel in tow to keep in proper trim and tack, to follow the tug, and steer accordingly; and, if injury results to the tow from negligence or mistake in these respects, the tug is not responsible.

3. Owing to its comparative independence of the winds and currents, a steam tug may perform a salvage service with comparative safety to herself, and therefore the matter of risk to herself and crew is to be estimated accordingly, in fixing the value of such service.

4. A steam tug of three hundred and four horse-power left Baker's bay, and overtook an iron ship of one thousand two hundred and thirty-five tons, worth forty-seven thousand dollars, drawing twelve feet of water, in ballast, drifting onto the west end of Chinook spit in seventeen feet of water at flood tide, near two hours before high water, with the wind blowing about eight from the south-east, and took her hawser and towed her under the lee of the east of Sand island, where, owing to the strength of the wind, which had increased to ten and veered to south-east by south, she was compelled to let her go in comparatively safe anchorage in twenty-three feet of water; but the ship, only letting go one anchor, dragged on to the spit, where she lay until next morning in about four or five feet of water at low tide, when the tug, and three others of near the same power, and working under the same management, returned to her, and pulled her off about two hours before high water, with a light breeze from the east by south, and the ship heading south and west, without any serious risk to the tugs or actual injury thereto. *Held*, that the service was a salvage service, and the compensation therefor fixed at five thousand dollars.

[In admiralty. Libel by J. A. D. Wass and George C. Flavel for salvage against the Allegiance, (David Morgan, claimant.) Decree for libelants.]

John W. Whalley and M. W. Fechheimer, for libelants.

Ellis G. Hughes and William H. Effinger, for claimant.

DEADY, District Judge. A. D. Wass and George C. Flavel bring this suit against the British ship Allegiance upon a cause of salvage, civil and maritime, for salvage service rendered by them to said ship with the aid of the steam tugs Brenham, Astoria, and Columbia, and their officers and crews, on January 10 and 11, 1879, in and near the north channel of the Columbia river, between black buoy No. 5 and the east end of Sand island. Upon due process and proceedings the vessel was seized and appraised at forty-seven thousand dollars, and delivered

---

[1][Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

to the owner, David Morgan, of Anglesea, Wales, upon a stipulation in the sum of thirty thousand dollars. The answer of the claimant denies that the service rendered to the Allegiance was a salvage service, and avers that it was only a towage service, worth not to exceed two hundred dollars. Afterwards, upon the stipulation of the libelants and claimant, A. M. Simpson, George Flavel, and A. D. Wass, as owners of the tugs, and E. Johnson, A. Malcolm, and D. M. McVicker, as part of the crew of the Brenham, were admitted to intervene herein as joint salvors with the libelants, and to become parties to the libel. The testimony is somewhat voluminous, and upon some material points conflicting. The master, mate, and two pilots of the Brenham, the master of the Astoria, the master of the light-house tender, the Shubrick, and of a merchant vessel, the McNear, were examined as witnesses by the libelants; and the master and two mates of the Allegiance, the master and two lieutenants and the boatswain and carpenter of the revenue cutter, the Corwin, for the claimant. After an extended examination of the testimony, and a careful comparison of the disputed points with the known circumstance of the channel, spits and tides of the locality, and after weighing well the intelligence, means of knowledge, candor, and credibility of the witnesses, I find the material facts of the case to be as follows: On the evening of January 9, 1879, the Allegiance, an iron ship of one thousand two hundred and thirty-five tons burden, two hundred and twelve feet in length, and drawing twelve feet of water, made the mouth of the Columbia river in ballast, on her way to this port. She stood off and on until morning, when getting pretty close to the breakers, and no pilot coming to her aid, she crossed the bar at a quarter past ten o'clock, with a fair wind from the southwest, under her topsails, foresail, foretopmast staysail, and jib, and passed red buoy No. 2 on the starboard tack, about eleven o'clock, nearly one hundred and fifty yards to the eastward of the channel, with a whole-sail breeze from the south by east, her course being about north-east by east. The master of the Allegiance had never been in the Columbia river before, but the mate had once, and told the master, as an inducment to come in without a pilot, that they would certainly find the steam tug and pilot in Baker's bay. At this time the tug Brenham was lying at anchor near the wharf at Fort Canby in Baker's bay, well around the point of the cape, and the revenue cutter Corwin was at anchor in the same bay, about two hundred yards to the north-north-east of her. The officers of the tug had known from early morning that the Allegiance was outside the bar, but had not gone out to give her a pilot or a tow because of the roughness of the bar. When the Allegiance passed the red buoy No. 2 the

weather was getting thick, and she had not yet made out the entrance to Baker's bay, and the master probably thought it was ahead of him in the direction in which he was sailing. Soon after the Allegiance passed the red buoy No. 2 she was sighted by the cutter, and it appearing to the master of the latter that the former was out of the channel, he gave the alarm by blowing his whistle. This attracted the attention of the Allegiance, and she at once commenced to shorten sail, luffed up to the wind, and checked her way, but drifted on before the wind and tide in a north-east direction. The tide was flood and lacked about two hours of high water. The current was running in at the rate of three or four miles an hour, while the wind had a velocity of about eight, and was increasing.

As soon as the Allegiance passed the cape, the tug called her pilot from off shore, got up her anchor, set her flag, and started after the Allegiance, to save her from being lost or going ashore, and overtook her about one and a half miles from the cape, beyond the black buoy No. 5, in seventeen feet of water, with her foretopsail and staysails and fore and main lower topsails set, her yards braced sharp up, on the starboard tack, drifting, without headway, and within two hundred yards of the breakers on the west end of Chinook spit. Here the Allegiance signified that she wanted the services of the tug, when the latter passed her a line, and took the ship's hawser, of about forty fathoms, on board, and commenced towing her out into the channel. By this time the wind had veered to about southeast by south. The tug put her helm hard a-port, and tried to haul the ship around against the wind, to take her back into Baker's bay; but owing to the strength of the wind upon her starboard bow, and the fact that her sails had not all been taken in and were aback, the tug was unable to do so, and then she commenced towing the ship in the channel towards Astoria. After towing her in this direction from three fourths of an hour to an hour under the pressure of seventy-eight pounds of steam, and making from three-fourths of a mile to a mile, the wind increased to ten, and the tug was unable to tow the ship any further, and both were drifting by the force of the wind and tide in the direction of the breakers on Chinook spit, whereupon the tug blew her whistle and signaled the ship to let go her anchor. The port anchor only was let go, and it was let go foul, the chain being around the stock, and when thirty fathoms of chain had run out and the anchor had bit or taken hold, the tug cut the hawser—it being unsafe to attempt to back and cast it off—and proceeded to Astoria for assistance. At this time the ship was on the lee side of the channel in three and one half fathoms of water, with some of her sails not yet wholly furled. She

paid out forty fathoms of chain on her port anchor, but it was not sufficient to hold her, and she dragged to the northward on the sands about two hundred yards. The starboard anchor, being on the rail, was not let go at the signal from the tug, but was let go about the time the ship got on the sands, and lay near her forefoot until night, when it was hove up for fear the vessel might float upon it on the next high water. Between three and four o'clock in the afternoon the tug Brenham returned from Astoria, accompanied by the tugs Astoria and Columbia, and found the Allegiance on the sands, and two or three feet out of the water, and, being unable to render her any assistance at the time, proceeded with the Columbia to Baker's bay, while the Astoria remained in the vicinity for an hour and a half, and then joined her companions at the cape. On the morning of the eleventh the three tugs went up to the relief of the Allegiance about nine o'clock, going within about one hundred and seventy-five yards of her. The weather was fair, with a light breeze from the east by south, and a considerable swell from the incoming tide. The pilot of the tug Brenham, E. Johnson, boarded the ship, and attempted to negotiate with the master for a tow. The latter said he wanted a pilot and a tow, but declined to make any specific terms for compensation, and the result was that the Brenham and Astoria put their hawsers on board the ship, while the Columbia was ahead with her hawser fast to the Brenham. The pilot, Johnson, remained on board the Allegiance, and with the assistance of a portion of the cutter's crew, who had been put on board for the purpose, got in the anchor, which had then about fifteen fathoms of chain out. The ship was lying in a bed which she had made for herself in the sand, in about four or five feet of water, and as the tide rose and her sails more or less filled, she rolled in her bed, but did not move forward. The anchor came in through the sand without materially affecting the position of the ship. The tugs commenced pulling on her at about half past ten, and she came off at nearly twelve o'clock, and about two hours before high water; when she was towed to Astoria by the tug Brenham, assisted by the Columbia as a matter of convenience, and not because such assistance was absolutely necessary.

At the time the Brenham first took hold of the Allegiance, the latter was in great danger of grounding in the breakers just to the northward of her, and must have done so, unless she had let go her anchors, only one of which was ready to let go, and probably then, as she was exposed to the whole force of the wind and tide setting her in that direction; and if the ship had been properly handled at the time the Brenham took hold of her, it is probable that she could have been then turned around and

taken in safety to Baker's bay. When the tug left the Allegiance inside of Sand Island, she left her in comparatively a good anchorage, by reason of the protection from the wind and tide by said island; and being unable to tow her any further or to turn her round and take her to Baker's bay, she did the best that could be done under the circumstances, by letting her go when and as she did; and it is very probable that if both her anchors had been let go at once she would have not dragged as she did on the sands. The Allegiance sustained no appreciable injury between the bar and Astoria; the tug Brenham incurred no extraordinary risk or danger in going to the Allegiance on the tenth, and towing her as she did; but both she and the Astoria did incur such risk and danger in pulling her off the sands on the eleventh, by touching the bottom on account of the swell and depth of water; but neither of said tugs sustained any appreciable injury therefrom. On the morning of the eleventh, when the tugs came up to the Allegiance, she was lying hard aground, heading about south by east, thus showing satisfactorily that she did not ground simply by the ebbing of the tide, but that she dragged on to the sands in high water. She was in no immediate danger; but as the tide rose and she commenced to float in her bed, and pound the bottom with the rise and fall of the sea, she would be in danger of springing a leak, and at high tide, if the wind had increased, as was probable, she would have gone farther up on the spit and beyond the reach of assistance, and ultimately been lost. Nor is it at all probable that the vessel could have been sailed off at high water. The tide, while it might lift her out of her bed so that she could float, would tend to set her higher on the spit, while the wind, being about southeast by south, would have the same effect, until she had steerage way, which it is almost certain she could not obtain, under the circumstances, in time to get off.

As to the value of the tugs there is no direct evidence. They are probably worth over one hundred thousand dollars. At the date of this occurrence there were four men employed on the tug Brenham, at the aggregate monthly wages of three hundred and fifty dollars, and found; besides which she carried two Washington territory pilots, E. Johnson and A. Malcolm, who were in the employ of the owners of the tug, and turned over their pilot fees to the manager of the same, Captain George Flavel, and received from him monthly wages for their services. George C. Flavel was master of the Brenham, and D. M. McVicker, the mate. A. D. Wass was master of the Astoria. The three tugs employed an aggregate of twenty-six men, including six pilots, whose monthly pay amounted to two thousand two hundred dollars, and found. The Brenham is of three hundred and four horse-power, the Columbia

two hundred and thirty-eight, and the Astoria three hundred and ninty-two but practically the Brenham is the most powerful. The tug Astoria was owned by the libelants, A. M. Simpson, George Flavel, and A. D. Wass, and the Brenham by said Simpson and Flavel, and the Columbia by said Simpson. The ordinary charge for towing a vessel from outside the bar to Astoria is from one hundred and fifty to two hundred dollars, and the time usually occupied in such service is from four to eight hours.

The principal point made by the claimant to the contrary of these conclusions is, that the tug was in the wrong in not taking the Allegiance back into Baker's bay, when she first took hold of her on the ninth. But assuming that this could have been done under the circumstances, it was certainly the fault of the ship that it was not done. When the tug put her helm hard a-port, and turned her head to the south-west, with the intention of making Baker's bay, the Allegiance would not come around, and the only alternative was to proceed up the channel for Astoria, and at least make an anchorage under the lee of Sand island. The reason the Allegiance did not come around was, that a portion of her sails had not been taken in, and, as soon as her head came up to the wind, were aback; and that she was without steerage way. The tug is not responsible for the steering or sailing of the tow. It was the duty of the latter to keep in proper trim and upon the right track, to follow the former, and to steer accordingly. If there was any negligence or mistake in any of these particulars the tug is not responsible for the consequences. The Merrimac. [Case No. 9,478.] Neither did the tug undertake that it was capable of towing the Allegiance under the circumstances, but only that it would try, and that it would exercise ordinary skill and diligence in so doing. The tug took hold of the vessel in an extraordinary emergency, with a view to save her from what appeared to be an impending peril, and therefore did not engage to do anything more than she could do with the aid of ordinary skill and diligence on the part of her master and crew. A salvor's compensation depends upon the success of the undertaking, but there is no implied obligation that he will succeed or that he is capable of so doing, and therefore he is only responsible for the exercise of ordinary skill and diligence in the use of the means or machinery with which he undertakes the salvage service.

The case is not like a mere contract for towage, where a tug meets or finds a vessel in a place of ordinary safety, and offers and agrees to tow her to a certain other point or place, as a mere business transaction. In such a case, undoubtedly, the master of the tug undertakes that his boat is properly equipped, and of sufficient capacity and power to do the service in question at the time

and under the circumstances proposed. The Merrimac, supra.

Upon this state of facts the libelants are entitled to recover as and for a salvage service, and the only question is as to the amount. There is no standard by which the compensation for such service can be absolutely measured. In each case the amount to be allowed must depend largely upon its own circumstances, varying from one half the value of the property saved to something more than a mere compensation for towage. Where the service is rendered by a steamer to a sailer, it often happens that a material service is rendered to the latter by which it is rescued from a serious and impending danger with very little risk or trouble to the former or to its crew. A vessel propelled by steam has a command over its motion and direction comparatively independent of the winds and currents, and may therefore approach a vessel in danger, and take her off with comparative safety to itself. In such cases, an important element in the value of the services, namely, the risk to the vessel and lives of the salvors, is more or less wanting, and they must be estimated accordingly. The services rendered the Allegiance, both on the tenth and eleventh, by the tugs, were, in my judgment, timely and material. She was rescued on each occasion from an impending peril, and probably saved from becoming a total loss. But at the same time this service was accomplished with little more than the ordinary risk attendant upon a towage service to the tugs and their crews. Under those circumstances it is my judgment that five thousand dollars is a fair compensation for the services rendered, including a counsel fee in this suit to collect the same.