## The Argus.

### National Dredging Co. *v.* The Argus.

*(District Court, D. Delaware. June 25, 1887.)*

**Towage—Loss of Tow—Liability.**

 The tug Argus left the Delaware breakwater with an ocean tow, on a morning when no storm signals were up, and at a time when other tugs and vessels were going to sea. Later in the day a violent storm, with blinding snow, set in, during which the master of the Argus could not find a harbor, and deemed it unsafe to anchor. Being off a lee shore, he put out to sea, and the tow broke loose, and was lost through the stress of the weather. *Held*, that the tug was not liable in damages for the loss of the tow, there being no negligence on the part of the tug, and there being no implied liability under the contract of towage for the use of more than reasonable care and skill in the management of the tow.

In Admiralty.

*Alfred Driver, Bradford & Vandegrift,* and *J. Warren Coulston,* for libelants.

*Levi C. Bird* and *Henry R. Edmunds,* for respondent.

WALES, J. This suit is for the recovery of damages alleged to have been sustained by reason of unskillful and negligent towage. In the month of December, 1882, the libelant made a contract with the owners of the tug Argus for the towing of the steam-dredge Ajax and two large dredging scows from Wilmington, Delaware, to Norfolk, Virginia, where the libelant was engaged in dredging for the United States government. The sum to be paid for this service was $700. The dredge was safely towed to Norfolk, and there delivered to the libelant in the latter part of December of the same year. The two scows were a few days afterwards towed down to the Delaware breakwater by another tug belonging to the respondents, and there anchored on the evening of January 8, 1883. Each scow was 100 feet long, 28 feet wide, 9½ feet depth of hold, with a carrying capacity of 525 tons, and had cost, when new, in 1881, $4,200. They had recently been calked, and put in good condition, and were strong and seaworthy. It was a part of the original contract that the Argus would furnish the hawsers to be used in towing. No time was expressly limited in which the dredge and scows were to be delivered at Norfolk, but the contract was all in parol, and it was well understood that a prompt performance was required and expected. Capt. Hallinger, the master of the Argus, went on board the scows immediately after their arrival at the breakwater, examined the fastenings by which they were attached to each other, fixed all the chafing gear, put more parceling on the lines furnished by the libelant, parceled his own hawsers, and intended to start out at once with the tow; but the indications of the weather being uncertain, and the sky cloudy, he concluded to wait until the next morning, when, if the wind should remain in the same quarter, north-west, and no storm signals were up, he would leave. At about 7 o'clock on the morning of the 9th the Argus did leave the breakwater with the scows singled out astern. The first scow was at the end of a nine-inch hawser, 75 fathoms long, which was made fast on both bits of the scow, at each corner, and came with the bridle to the center, and then to the tug. The second scow was made fast to the first one by two lines running from the after-corners of the first to the forward corners of the other, and, when thus attached, they were 25 feet apart. When the Argus had gone about 25 or 30 miles on her voyage, a heavy wind sprang up from the N. N. E., rapidly increasing to a gale, with a thick driving snow storm, which shut out the daylight, and rendered navigation along the coast both difficult and dangerous. It was during this storm that the scows broke loose from the tug, and were lost, the hindermost one going adrift first. One of them was afterwards recovered in a damaged condition. The storm was of unusual violence, and lasted 21 hours.

The libelant charges that it was gross and culpable negligence on the part of the captain of the Argus (1) to leave the breakwater when he did,

with the wind, sky, and weather as they then were, with every indication of an approaching storm; (2) in not coming to an anchor when the wind began to increase and the storm to grow more violent; and (3) because the lines and hawsers by which the scows were attached to each other, and to the tug, were insufficient, and not securely fastened.

Although the law defining the duties and the extent of responsibility of one who undertakes to perform a towage service was not much debated by counsel, it may be useful to state it as it has been expressed by an authority which must be controlling with this court:

"An engagement to tow does not impose either an obligation to insure, or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show either that there has been no attempt at performance, or that there has been negligence or unskillfulness, to his injury, in the performance. Unlike the case of common carriers, damages sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar circumstances." *The Webb*, 14 Wall. 414.

In *The Margaret*, 94 U. S. 496, cited by counsel on both sides, it was held that "the tug was not a common carrier, and that the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care was not required by her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work, until it was accomplished. The want of either, in such cases, is a gross fault, and the offender is liable to the extent of the full measure of the consequences." Such being the admitted law, it is only necessary to inquire whether Capt. Hallinger was guilty of a want of reasonable care and skill in the management of his tow, in any respect, as charged by the libelant.

And, first, were the state and indications of the weather on the morning of the 9th such as should have prevented a skillful and prudent navigator from setting out with a tow of this description? The libelants testify that the wind was fresh from the north-east, and that the indications of bad weather were so plain that it was unsafe for the Argus to go out. Capt. Hammond, of the tug North America, which was lying at the breakwater at the time, is positive in his recollection of the direction and force of the wind. He says it was blowing from the N. N. E. at the rate of 29 miles an hour; but he qualifies his opinion of Capt. Hallinger's imprudence by saying: "Everybody is not alike in their judgment. For my part, I don't think I would have gone out; but with the boat Capt. Hallinger has, with more buoyancy than my own, he had, of course, to use his own judgment." The value of Capt. Hammond's opinion is also impaired by his own action on the 9th. He had received a dispatch from Washington on the afternoon of the 8th, notifying him that a three-masted schooner was ashore, 13 miles south of Ocean City. He went first to the signal station on the breakwater, to ascertain the state of the weather, and then to the pier (at Lewis) after

wreckers and a surf-boat; and, having procured them, he decided not to go out that night, because the weather looked rather bad. But he did go out the next morning, about half an hour after the Argus started; thus following the example and confirming the judgment of Capt. Hallinger. He steamed away 43 miles south, and at about noon came to anchor off the beached schooner, and sent his boat ashore; but, before he could run a line to the wreck, the storm, which had begun about 11:30 A. M., increased so rapidly, and to such a degree, that he had to abandon the effort to save the vessel, which went to pieces that night. The storm was not so bad up to about half past 2 or 3 in the afternoon, and before that time you could see some little distance. His anchor dragged, and he had to steam out into deeper water. It was a bad, ugly night. A good many vessels went ashore, and several lives were lost. The concurrent testimony of the witnesses on both sides is that the storm was extraordinary in violence and duration. Their united memory could not parallel another like it. Capt. Hammond admits that it would have been "foolishness" to attempt to go back to the breakwater in the night, in the teeth of the storm and over shoals, nor is he willing to say that it would have been prudent for the captain of the Argus to anchor along the beach with the scows, in tow. "Question. It was a very nice question which was the best for him that night? Answer. Yes; I guess everybody wanted to know a little that night what to do. Out of forty-three aboard of my boat I had five that weren't seasick. L. t. 18."

The Argus and the North America were not the only vessels that left the breakwater on that morning. The revenue cutter Hamilton and the steamer Hector also went to sea at about the same time, and two schooners came out from the bay, or the breakwater, and sailed down the coast. The Hector returned early in the afternoon, but the Hamilton kept on, and made Lyn Haven roads, inside of Cape Henry, at 9:30 P. M. The pilot of the Hamilton, an experienced navigator, and familiar with the coast, confirms the statement of Capt. Hallinger that there was nothing threatening in the weather when they left. The Hamilton had no special call to go out, and her officers did not see any signs of the coming storm that raged with such fury later in the day. The pilot thinks the wind was from the north, and moderate, at 7 A. M. The record of the signal offices and light-house stations, on either side of the bay, show some variance as to the direction of the wind. At Cape May point, 15 miles north-east from the breakwater, the wind, at sunrise on the 9th, was light N., with cloudy weather and low surf. At Cape Henlopen beacon light, the entry is, "Cloudy, N. W., [wind,] moderate." At Cape Henlopen light-house, at 6 A. M., the wind was N., moderate, cloudy weather. At Cape Henlopen station, at sunrise, the entry is, "Fresh breeze, north-east, heavy surf, cloudy."

It would be useless labor to review the testimony in detail. The depositions are unnecessarily numerous. The crews of the North America and of the Argus corroborate their respective captains, between whom there appears to have been some feeling of rivalry, if not of enmity. Capt. Hallinger's statement is consistent with collateral facts, and is fairly

entitled to credit. He says that when he left the breakwater the wind was a little west of north, and moderate. No storm signals were up, and he thought it safe to proceed. He would not have started if the wind had been from the east, and blowing on shore at the rate of even five miles an hour. Everything went on well until he made Fenwick's island, about noon, up to which point his course had been south. After rounding the island, the wind was more off shore, and he changed his course to S. S. W. When he got below the island, a storm of wind and snow began, which increased with such rapidity and violence that it was impossible for him to return. His only place of shelter, short of Norfolk, was Chincoteague bar, if he could reach it before night; but at 4 o'clock it began to grow dark, and it was then that the stern scow broke loose, and went adrift, the lines having chafed off. Soon after this he passed the North America, which was at anchor, and hailed for help to pick up the lost scow; but the storm was too violent to admit of aid from that quarter. In a short time the snow became so thick that nothing could be seen from the tug, and, as he could not tell whether he was above or below Chincoteague inlet, which can only be approached from the southward, and its vicinity abounds in shoals, and it was hazardous to anchor in shore, he was compelled to haul off into deeper water, where he laid to, keeping up steam, and holding onto the remaining scow. It was not long before this scow also chafed off its hawser, and was lost, the tug springing ahead when released from the drag.

A careful examination of the evidence has led the court to the conclusion that the charges of a want of reasonable skill and care on the part of the Argus have not been sustained. The Argus was a strong and powerful tug, built and adapted expressly for ocean towing, well equipped, and commanded by a master who had had many years' experience in the business. He was unfortunate in encountering an unprecedented storm, but he was unable, as were other masters who went to sea at the same time, to foresee its coming. He did not insure the tow against anything but his own negligence and recklessness. He used his best judgment in forecasting the weather, and cannot be held accountable for the want of infallibility. He considered the risk too great to anchor in shore, and, in the blinding snow-storm, he was unable to find a harbor. He had the right to consult the safety of his own vessel in preference to delivering the scows safely at Norfolk, and was justified in putting out to sea when off a lee shore. "The owner of a vessel does not engage for the infallibility of the master, nor that he shall do in an emergency precisely what, after the event, others may think would have been the best." *Lawrence* v. *Minturn*, 17 How. 100; *The James P. Donaldson*, 19 Fed. Rep. 266. There is no proof that the hawsers and lines were insufficient or insecurely fastened. The presumptions are all the other way. The libel must therefore be dismissed.