### THE JACOB BRANDOW.

### SCHIAFFINO *v.* THE JACOB BRANDOW.

#### (*District Court, D. South Carolina.* July 3, 1889.)

TOWAGE—DUTIES AND LIABILITIES OF TUGS.

A tug, with a bark in tow, the master of the latter having been expressly instructed to follow the course of the tug, proceeded obliquely across a stream to within a short distance of the bank, then changed its course, and, without further direction to the bark, proceeded parallel with the bank. The bark, though in full sight of the tug's change of course, continued on the oblique course, and ran ashore. *Held*, that the tug was not liable for the damages.

In Admiralty. Libel for damages caused by negligence of tug.

*J. P. K. Bryan*, for libelant.

*J. N. Nathans*, for respondent.

SIMONTON, J. The Cassabona came to this port with a cargo of sulphur for the Etiwan Phosphate Company. The company engaged the tug Brandow to tow the bark up Cooper river, to its works on Ship-Yard creek. This creek—about 150 feet wide—runs into Cooper river between mud-banks, which are covered with salt marsh to the water's edge. It has several bends in it. Just before the Etiwan landing is reached, there is a considerable bend. In order to pass it, vessels go nearly to the opposite bank, coming into full view of the landing. There they change their course obliquely across the creek, and, approaching the bank at a point about 700 feet from the landing, proceed on a course parallel to the bank of the creek, straight to the landing. When the tug took hold of the bark her master instructed the interpreter who had been engaged to translate his orders that the bark must follow the course of the tug. He then, with a tow-line 180 feet long, proceeded up Cooper river with the bark, and turned into and up Ship-Yard creek. During the towing, the master of the bark, with his interpreter, stood on the forward part of the bark, in easy hearing distance. The tug-master gave such orders as he deemed necessary, which were at once interpreted to the master. The latter extended them to the men at the wheel,—the mate and a seaman. No orders were given but such as came from the tug. Nothing of importance happened until the last bend was reached. This bend was on their left. The tug, in advance, drawing some nine feet of water,

rounded the bend as has been described. Then she changed direction. The bark, following, approached the opposite bank, and when she had approached sufficiently near she got orders from the tug to change direction, and was put on the course obliquely across the creek. When the tug got within between 15 and 20 feet of the bank it straightened out on the course parallel to the bank, going to the landing. The bark pursued her oblique course without change, and approached the marsh within 15 feet. The tug-master, observing this, called out: "Where are you going? Have you no rudder on that bark? Port." Attempting to obey this order, the bark found herself aground. The tug, not being able to pull her off, proceeded to the landing and procured two lighters, which she towed along-side the bark. She then left for Charleston, and never came back. The bark, fearing a careen, put out four lines, which parted. The next afternoon, at high water, she got off with her own appliances, having been ashore 24 hours. She reached the landing, and discharged cargo. Neither the master of the bark nor his interpreter had ever been up the creek. The tug-master knew it well. This action is for damages sustained by reason of the negligence of the tug-master. The contract was between the Etiwan Company and the tug. The action is not on the contract. It proceeds upon the duty imposed by law upon the tug not to cause injury to her tow. *The M. J. Cummings,* 18 Fed. Rep. 178. The responsibility of a tug to her tow cannot be better expressed than in the language used by the supreme court in *The Margaret,* 94 U. S. 494:

"The tug was not a common carrier; * * * she was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. * * * The tug was the dominant mind and will in the adventure. It was the duty of the brig to follow her guidance, to keep as far as possible in her wake, and to conform to her directions. The exercise of reasonable skill and care within this sphere was incumbent on the tow."

That is to say, both the tug and the tow must exercise reasonable care and skill. The former dominates, guides, and directs. The latter follows her guidance, keeps in her wake, and conforms to her directions. When the tug and tow had rounded the bend, the former gave the order which changed the direction of the bark obliquely across the creek. She followed this direction, and kept it, notwithstanding that it carried her certainly into the bank. She could see that the tug had straightened her course parallel to the bank. She was under specific directions to follow in the wake of the tug. She was not a barge not manned, blindly following the impulse of the tow-line. She had an intelligent master, mate, and an experienced crew. She steered well. While the tug was bound to exercise reasonable skill and care, she had the right to expect corresponding care and skill on the part of the tow. She was not bound to repeat positive orders; nor, when they were in the open creek, past the bends, was she bound to exercise unnecessary vigilance to see that the tow was in her wake. The tow did not follow this direction. In consequence of her negligence in this regard she took the bank. The libel is dismissed.