PEDERSON v. JOHN D. SPRECKLES & BROS. CO.

(Circuit Court of Appeals, Ninth Circuit. March 3, 1898.)

No. 418.

1. TOWAGE—METHOD OF FASTENING LINE.

On the preponderance of the evidence, *held*, that in towing a schooner it is not good seamanship, when the line is passed through the breast chock, to make it fast to the pawl bitt, as this brings it at such an angle as to put a great and uneven pressure on the chock, and a heavy strain on the line; that, if passed through the breast chock, the line should be fastened to the windlass bitt; and that the best method is to have as straight a lead as possible.

2. SAME—SPEED OF TOWAGE.

In towing a schooner about 90 feet in length, and of some 87 tons, gross, with a 5-inch Manilla line, in a smooth bay, 6 to 7 knots an hour is not excessive or dangerous speed.

3. SAME—RESPONSIBILITY FOR FASTENING TOWLINE.

When a tug takes in tow a schooner, having her own officers and crew on board, who take control and management of the fastening of the towline to their vessel, they are bound to see that it is securely fastened; and the tug is not responsible for any failure in this respect.

4. SAME—RECIPROCAL DUTIES.

A tug engaged in towing is not bound to exercise the highest possible degree of skill and care. Her duty is to use reasonable care and skill,

and she has a right to expect corresponding care and skill on the part of the tow, when the latter is in charge of her own officers and crew.

**5. SAME—PERSONAL INJURIES.**
    A tug, towing a schooner manned by her own officers and crew, *held* not liable for personal injuries occasioned to the schooner's mate by the breaking of the breast chock, through which the line was run, where the accident was due to bad seamanship of the mate, in causing the line to be run through the breast chock and fastened to the pawl bitt, instead of to the windlass bitt.

Appeal from the District Court of the United States for the Northern District of California.

H. W. Hutton, for appellant.
Shortridge, Beatty & Brittain, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge.   This is a libel in personam by Louis A. Pederson, appellant, to recover damages from the John D. Spreckles & Bros. Company for injuries received.   The undisputed facts are substantially as follows:   The steamer Crown of England was wrecked at Santa Rosa Island, in Santa Barbara Channel, December 1, 1894. The California Iron & Wrecking Company was employed by the owners of the Crown of England to recover the machinery from the wreck; and, to assist in this work, the company employed the schooner S. Danielson and the tugboats Kittie O'Neill and Vigilant.   The schooner was owned in part by one Mrs. Gruggel, wife of its captain.   It had a gross tonnage, 87.55; net tonnage, 83.20; net length, 91.9; breadth, 27.7; depth, 6.8 feet,—carried about 5 tons of iron, and was about 10 years of age, and in good condition.   The tug Vigilant was owned by appellee.   The S. Danielson and the Vigilant lay at anchor all night before the accident, side by side, in Beechers' Bay, on the east side of the island.   On the morning of January 6, 1895, about 8 or half past 8, the S. Danielson, upon the suggestion of the tug, hauled in her anchor, and started to drift, while waiting for the tug to come alongside and take her in tow.   After drifting about half a mile, the tug came alongside, and about 9 o'clock made fast to the schooner, and began towing.   Appellant, who was the mate of the schooner S. Danielson, passed a 5-inch Manilla rope out to the tug, to be used in the towing.   The line was passed through the breast chock on the port side, and was made fast, under his supervision, to the pawl bitt.   Between 40 and 50 fathoms of line were passed out before the master of the tug Vigilant signified that they had length enough.   While engaged in parceling the line, and standing on the side of the line, between the line and the capstan, the chock broke; and appellant was thrown against the capstan by the snap of the line, and his leg was broken, and so severely injured that amputation was made necessary.   Some 10 or 15 minutes thereafter the line parted.   The time occupied in towing before the accident is variously estimated by the witnesses at from 15 to 20 minutes.

What caused the accident?   Was the appellee guilty of any negligence?   The contention of appellant is that the accident was caused

by the negligence of the parties in charge of the Vigilant, in towing at such an excessive rate of speed that the chock through which the towline was passed was pulled in two; that the appellee was guilty of negligence, in not supervising or directing the arrangement of the towline, in not watching the effect of her towing upon the schooner, and in towing at an excessive speed. It is claimed on behalf of appellant that there is a substantial agreement on the facts, and that the only questions involved herein are questions of law. The contention of the appellee is that the accident was caused by the acts of appellant and those acting under his direction, in putting the line through the breast chock, and making it fast to the pawl bitt, instead of the windlass bitt; that improper steering by the captain of the schooner, in charge of the helm, also contributed to the breaking of the chock, by increasing the strain thereon; that, in failing to perform his duty in this respect. appellant was guilty of such negligence as bars him from recovering any damages. It is claimed by appellee that the questions involved herein are purely questions of fact, upon which there is a conflict of evidence, and that the decision of the trial court should not be disturbed on this ground.

The tug and the schooner were each in charge of their respective officers and crew. Each was properly manned and equipped. There were no visible defects in either. The weather was calm and clear, there was a light wind, and the water was smooth. The chock on the schooner is used to keep the line in place, and the bitt to which the line is fastened gives the strength for towing purposes. The decided preponderance of the evidence establishes the facts contended for by appellee, that it is not good seamanship upon the part of the officers and crew of the schooner, when the line is passed through the breast chock, to make it fast to the pawl bitt; that, if the line is passed through the breast chock, it should, in order to be safe, be fastened to the windlass bitt; that when the line is put in the breast chock, and fastened to the pawl bitt, it is at such an angle as to bring a great and uneven pressure on the chock, and a heavy strain upon the line; that the best method is to have as straight a lead as possible; that the straighter the lead, the safer the tow. This testimony is not in any manner weakened by the fact that the schooner had been previously towed in safety, for a longer distance, with the line placed in the breast chock, and fastened to the pawl bitt. The question as to who furnished the line, or who first suggested its use, does not clearly appear. But, in view of the other facts, it is wholly immaterial. There is no suggestion that the line was not a proper, strong, and safe one, and no claim is made as to there being any defect therein. Appellant, as the mate of the schooner, had charge and control of her forward part. He was at his post of duty. Capt. Randall had charge of the tug. He called upon the schooner to give him the end of the line. It was passed to him by appellant. Pederson, in the ordinary discharge of his duty as mate of the schooner, directed where and how the line should be placed. It was laid through the breast chock, and made fast to the pawl bitt, of the schooner. Signals were then given, and the tug started on its course. In the light of these circumstances, it seems to be a self-evident proposition

that the tug could not have been at fault unless at the time of the accident she was towing at an excessive speed.     Touching this point, the most that can be said in favor of appellant is that there was a conflict of evidence as to the rate of speed.     Appellant's witnesses testified that in their opinion the tug was towing at a rate of 9 or 10 knots an hour, while the testimony on the part of appellee placed it at from 6 to 7 knots an hour.     The question as to whether the speed was excessive is not to be determined solely from the rate.     It depends upon the condition of the tow, the line, and other surroundings. The questions are whether she was going at such a speed that no damage would be liable to ensue therefrom; whether she was exercising due caution and reasonable diligence.     If the speed of the tug caused the accident it was excessive.     The great preponderance of the evidence is—taking into consideration the tonnage and size of the schooner, the strength of the line, and state of the weather, wind, and water—that the tug was towing at a reasonable and safe speed, not exceeding 7 knots an hour, and was not guilty of any fault, and that the speed of the tug was not the proximate cause of the breaking of the breast chock on the schooner.     While there was a slight conflict as to the rate of speed, the witnesses substantially agreed that 7 knots an hour was safe and reasonable.     The witness Titchworth, who had been about 4 years on the Vigilant, and was on the tug at the time of the accident, and had been engaged over 10 years in the towing business, testified that the Vigilant was a steady tug in her pulling, regular in her movements, in perfect condition, and that 7 knots an hour "was a safe speed."     Thompson, who was captain of the tug Rescue, in the employ of the Merchants' & Shipowners' Towboat Company, and had been engaged for 20 years in the towing business, on all kinds of boats and ships, in all parts of the coast, including the Santa Barbara Channel, under all conditions of wind and weather, testified, in reply to questions, as follows:

"Q. In towing a schooner of the dimensions and the tonnage of the Danielson. I wish you would state to the court whether it would be safe and proper to use a line of from 40 to 50 fathoms length in towing such a schooner in the Santa Barbara Channel, when the water is smooth, the wind fair, and the rope or hawser a 5-inch Manilla line?     A. It would if it was smooth and the wind fair, as you say.     It would be line enough.     I should accept that: yes: new rope, good line,—if the distance was not too long, and I expected not to get different weather, or anything like that.     Q. As to the rate of speed that it would be proper towing, with a schooner such as the Danielson, under the conditions I have named, would you say that a speed of from 5 to 6 or 7 or 8 knots would be a proper, reasonable, and careful speed to tow?     A. I should say a speed of 7 or 8 knots would be all right, if it was smooth, with a new 5-inch line.     I should tow that fast if I was doing it; after I got fairly started,—got way on my tow.     If it was rough, and I considered it necessary to go slow, I should do so.     If it was smooth, I should certainly go as fast as I could; and I think that would be just about the rate of speed,—8 knots on a vessel like that."

Capt. Harvey, assistant superintendent of the Merchants' & Shipowners' Towboat Company, who had been engaged in the towboat business for 30 years, under various conditions, and upon all kinds and character of vessels, testified as follows:

"Q. Take the schooner Danielson, whose dimensions I have given you, in the Santa Barbara Channel, with smooth water, fair wind, being towed by

the tug Vigilant; would a 5-inch line—say, from 35 to 40 or 50 fathoms—be a proper length of line to have out, towing such a schooner? A. I should say it would be. Q. As to the rate of speed, captain, that it would be safe to tow a schooner under those circumstances; what would you say as to that? A. I should say it was safe for a tug to pull all it could. Q. 6 or 8 or 9 knots would be safe, in point of speed? A. Yes, sir; that line will hold that boat, and more too."

Capt. Gray, who was the superintendent of the same towboat company, and had been in the business for over 20 years, and was familiar with the Santa Barbara Channel, testified as follows:

"Q. What would you say as to the speed which it would be safe and proper to tow a schooner of these dimensions in quiet, still water, with a tug such as the Vigilant, and with a 5-inch Manilla rope, of about 40 or 45 fathoms? A. I should tow just as fast as the tug would tow her. Q. Would it be safe speed to go at, say, 5 or 6 or 7 knots an hour? A. Yes, sir; perfectly safe."

Rosenberg, a witness for appellant in rebuttal, on cross-examination, testified as follows:

"Q. What would you say as to the speed of towing a schooner such as the Danielson, * * * smooth water, fair wind, very lightly laden with some wreckage, and it was being towed by a strong steam tug, the Vigilant; the line made fast to the pawl bitt, passing through the after port chock, and the tug ahead; what would you say as to reasonable speed to tow under those circumstances, a 5-inch Manilla rope being used? A. About 6 or 7 miles an hour."

But it is earnestly argued by appellant that the testimony is undisputed that the speed of the tugboat actually caused the breaking of the after chock. This position is sought to be maintained upon the testimony of Capt. Randall, the master of the tug Vigilant, given with reference to the manner in which the line was made fast, as ascertained by him after the accident. The testimony of the other witnesses was on the assumption that the line was properly placed and fastened. To fully understand that portion of the testimony of Capt. Randall relied upon and quoted by appellant, it is necessary to refer to other parts of his testimony. He had testified in chief that the tug started at slow speed, that after towing about 15 minutes the chock was carried away, and that at that time the tug was towing about 6 knots.

"Q. When the vessel started, how fast were you going? A. We started gradually, and gradually got on the way to about 6 knots. Q. How long after you started before you were going at the rate of about 6 knots? A. About 4 or 5 minutes. Q. For 10 minutes you had been going at the rate of 6 knots? A. Yes, sir. Q. No faster? A. No, sir. Q. The same rate of speed? A. The same rate of speed. The engine was not speeded up at all."

He further testified that the tug at the time of the accident slowed up and stopped, and, after ascertaining what had happened, again started ahead at the same rate of speed as before, and after towing 10 or 12 minutes the line parted. Upon his cross-examination the following questions were asked, and answers given:

"Q. Did you notice through which chock the towline was leading? A. Yes, sir; the breast chock. Q. Did you notice where it was made fast to? A. No, sir; I could not see that. Q. Do you think that you could break a chock line like that, towing a schooner such as the Danielson 6 knots an hour, and under the conditions you were towing her that morning? A. No, sir; not with a fair lead. Q. What do you mean by a 'fair lead'? A. A straight lead. * * * Q. You went ahead on that morning without reference to where the towline was made fast to? A. We allowed that the people on the schooner

would aid us in the matter, to help us out, by not making those lines fast to the wrong place."

Next come the questions and answers so confidently relied upon by counsel:

"Q. I ask you whether on that morning you went ahead without reference to what part of the schooner the towline was made fast to? A. Yes, sir. Q. Six miles an hour was too fast, under the condition that that line was made fast? A. No. sir. Q. How did the chock come to break, then? A. It was too fast. It proved it. It certainly was too fast. Q. Under the conditions at which the line was made fast? A. It was too fast."

It is evident that this language had reference to the condition of fastening the line on the pawl bitt after placing it in the breast chock, which was a fact unknown to the officers and crew of the tugboat until after the accident. This is made clear by the answer of the witness when recalled on behalf of the appellee:

"Q. The way in which the line was made fast, then, you did not know? A. I did not know: no, sir. Afterwards I seen where the line had been made fast, and knew the chock it was in; after we went alongside. Q. To what would you, then, attribute,—all told in one answer, covering the whole case,—in your best judgment, the breaking of the chock? A. Bad steering, and the line being made fast in the way it was, and possibly a bad casting. The speed of the vessel had nothing to do with it. It must have broke if we had been going at 2 or 3 knots."

This testimony, instead of showing that the tug was towing at an excessive speed, tends to show that the line, after passing through the breast chock, was fastened to the wrong bitt, and that the negligence was upon the part of the officers and crew of the schooner, instead of upon the part of the tug. It is shown by the testimony that the tug was fully adequate to the work. It was managed with reasonable care, judgment, and skill. It performed its duty in an ordinary, careful, and prudent manner, and did its entire duty, unless, as is claimed by appellant, it was its duty to see that the line was properly placed and fastened on the schooner before it started to tow. A vast number of authorities are cited by appellant to the effect that the tug dominates, guides, and directs; that the tow keeps in her wake, and conforms to her directions; that the tug must furnish the motive power, and direct the location of the tow; how she shall be lashed; with what fastening she shall be secured; to see that her tow is properly made up, and secured with lines of proper strength. Many of these cases are in relation to the duties of the tug in the towing of canal boats and barges, which have no life, voice, or control in making up the tow; and in all these cases it is held that it is the duty of the tug to see that the lines of the tow are properly, sufficiently, and securely fastened, and that, if the tug fails in this duty, she is guilty of a maritime fault. But such cases have no application to a case like this, where the schooner had its own officers and crew on board, and, in pursuance of the custom in this respect, took full charge, management, and control of these matters. The distinction between the cases is too manifest to require extended discussion, and is clearly illustrated in the decision of the court in The Quickstep, 9 Wall. 665, 670, which is one of the leading cases relied upon by appellant. In the course of the opinion the court said:

"If the tug, in constructing the tow, used the lines furnished by the different boats, yet, as each boat was independent of the other, no responsibility can attach to either for the breaking of the line which she did not provide, and had nothing to do with making fast."

The testimony shows, without conflict, that it is the custom, in all cases where the tow has its own officers and crew on board and in charge, for the officers of the vessel to arrange all the preliminary matters, such as placing and making fast the towline; that such matters were within the duty of the appellant to perform; and that he did in fact perform that duty. Every case should be determined with reference to its own peculiar facts, circumstances, and conditions. In The Allie & Evie, 24 Fed. 745, 749, Brown, J., said:

"In whatever form the question comes up,—whether as to seaworthiness, adequacy for the work, or the time of starting,—it is a practical question of reasonable prudence and judgment; and as regards seaworthiness in general, or the adequacy of the tug for the work undertaken, there is no other final criterion than the judgment of practical men versed in the business, and the customs and usages of the time and place, viewed as representing the judgment and knowledge of the time. To show this, the custom and practice of nautical men is admissible."

See, also, The Battler, 62 Fed. 612, 614, and authorities there cited; The Merrimac, 2 Sawy. 586, Fed. Cas. No. 9,478; Burns v. Sennett, 99 Cal. 363, 33 Pac. 916.

The general rule as to the duty and liability of a tug in towing is clearly expressed in The Webb, 14 Wall. 406, 414. Among other things, the court said:

"It must be conceded that an engagement to tow does not impose either an obligation to insure, or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show either that there has been no attempt at performance, or that there has been negligence or unskillfulness, to his injury, in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services."

In The Margaret, 94 U. S. 494, 496, the court said:

"The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished."

See, also, The Jacob Brandow, 39 Fed. 831; The Argus, 31 Fed. 481, 483.

The law applicable to this case is that both the tug and the tow must exercise reasonable care and skill. While the tug was bound to exercise reasonable care and skill, she had the right to expect corresponding care and skill on the part of the schooner. The Jacob Brandow, 39 Fed. 831; The Sagua v. The Grace, 42 Fed. 461; The Ciampa Emilia, 46 Fed. 866, 868; The Invertrossachs, 8 C. C. A. 87, 59 Fed. 194, 198; The Margaret, 5 Biss. 353, Fed. Cas. No. 9,068; The Allegiance, 6 Sawy. 68, Fed. Cas. No. 207; Sproul v. Hemmingway, 14 Pick. 1. The contention of appellant that the happening of the accident raised a presumption of negligence on the

part of the tug cannot, therefore, be sustained.    The burden of proof in this case was upon the appellant to show affirmatively, by a clear preponderance of the evidence, that the tug was guilty of negligence.    1 Shear. & R. Neg. § 57.    This he failed to do, and he is not, therefore, entitled to recover any damages.    It is true, as was said in The Webb, supra, that:

"There may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it."

In The Joseph B. Thomas, 86 Fed. 662, this court said:

"There are cases where the fact that the accident happened under given conditions, and in connection with certain circumstances, will amount to evidence of negligence sufficient to charge the defendant."

See, also, 1 Shear. & R. Neg. § 59.

In cases where no questions are raised as to what caused the accident or the injury, and the circumstances are of such a character as to show that the thing which did happen would not have occurred unless there was negligence upon the part of the person having charge and control of such thing, then the presumption contended for would apply.    But it would be a strange construction of this rule to apply it to a case like the one under consideration, where all the facts as to the cause of the accident are in dispute, and nothing occurred which, of itself, tended to show that the tug was at fault.    On the other hand, it was the chock on the schooner that first gave way and caused the line to hit appellant, and this was the real cause of the injury to him.    The presumption, therefore, if any is to be indulged in, would be that the breast chock was defective, because it broke.    The line did not part for several minutes after the accident occurred, and its parting had nothing whatever to do with the injury complained of.    Moreover, the testimony tended very strongly to show that it did not part on account of the speed of the tug, but was caused by chafing after the breaking of the chock.

Numerous other minor questions were discussed by counsel, which we deem unnecessary to refer to, as the views already expressed are decisive of the case.    Upon the whole case, we are of opinion that the accident was caused by the negligence of those having charge of the schooner, and that the tug was not in any wise at fault.    The decree of the district court is affirmed.